IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERIN GALFER,

Plaintiff,

v.

CHICAGO BOARD OF EDUCATION,
PEDRO MARTINEZ,
and WILL FLETCHER

Defendants.

Case No. 22-cv-00571

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Erin Galfer ("Galfer") brings suit against Defendants Chicago Board of Education ("BOE"), Pedro Martinez ("Martinez"), and William Fletcher ("Fletcher") under 42 U.S.C. § 1983, alleging that they deprived her of her liberty to pursue her occupation without due process by making stigmatizing public statements about her in connection with her termination. Galfer also alleges state law claims of defamation, false light invasion of privacy, and intentional infliction of emotional distress. For the reasons stated below, Defendants' motion for summary judgment [135] is granted.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such

1

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND[1]

### I.    Local Rule 56.1

"Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite

---

[1] These facts are taken from the Defendants' statement of facts [141] and Galfer's statement of additional facts [146] and are undisputed unless otherwise noted.

the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (quotation omitted). "We have frequently said that it is within the district court's discretion to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014).

A response to a statement of facts must admit, dispute, or admit in part and dispute in part with specificity the asserted facts. LR 56.1(e)(2). A response may not assert legal arguments except to make an objection, and any argument that the objectionable material should not be considered should be included in the party's response or reply brief. *Id.* A response may not assert any new facts. *Id.* To dispute an asserted fact, specific evidentiary material that controverts the fact must be cited and explained. LR 56.1(e)(3). Galfer's response to Defendants' statement of facts violates these rules. *See e.g.*, [145].

Defendants argue that many of Galfer's responses to their statements of facts should be stricken and those facts deemed admitted. [153] at 2. Specifically, Defendants argue that 49 of Galfer's responses fail to respond to all the asserted facts and 63 of Galfer's responses improperly advance legal arguments and additional facts that do not materially controvert Defendants' asserted facts. *Id.* at 3-5. Galfer argues

3

that she does not raise unresponsive facts or improper legal argument. [157] at 2. Galfer also argues that Defendants make overbroad requests to strike and fail to specify which part of Galfer's responses are additional facts or improper argument. *Id.* at 3-4. The Court has discretion to strictly enforce Rule 56.1. *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011). In its discretion, the Court declines to strike the entirety of the Galfer's responses to the Defendants' statement of facts. However, the Court will disregard Galfer's "responses that do not cite specific portions of the record or that contain irrelevant information, legal arguments, conjecture, or evasive denials." *Boyce v. Carter*, No. 12 C 5372, 2014 WL 4436384, at *1 (N.D. Ill. Sept. 8, 2014) (citing *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)).

Galfer makes repeated hearsay objections to the Defendants' reliance on public reports issued by the Office of Inspector General. Galfer asserts Defendants cannot rely on the reports for their statements of facts because they are inadmissible hearsay. *See e.g.*, [145]. Defendants argue that the reports fall under the public records hearsay exception under Federal Rule of Evidence 808(8), or alternatively that the reports are admissible because they are not offered by Defendants for the truth of any matter asserted in the reports. [13] at 4-5. "[A]n out-of-court statement is not hearsay—and is generally admissible—if it is *not* offered to prove the truth of the matter asserted." *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018) (emphasis in original). Here, the statements contained in the public reports are directly relevant to Galfer's claims and the Court may consider them for the non-hearsay purpose of establishing the Inspector General's findings. Galfer attributes

4

those findings to Fletcher and alleges that the findings are defamatory statements. The Court may therefore consider the statements in the public reports without considering them for the truth of the matter asserted.

## II.    Factual Background[2]

Galfer was the principal of Marine Leadership Academy ("MLA") in the Chicago Public School ("CPS") system from 2015 until August 31, 2021 when she became the acting chief of the CPS Office of College and Career Success. [141] at ¶¶ 2-3. Martinez was the Chief Executive Officer ("CEO") of CPS beginning September 29, 2021. *Id.* at ¶ 8. As CEO, Martinez exercises supervision and control over all schools within the CPS system and he has all the duties and powers authorized by the Illinois School Code and all such additional duties and powers as may be granted by the BOE. *Id.* Fletcher has been the Inspector General for the BOE since July 7, 2020. *Id.* at ¶ 10. As Inspector General, Fletcher is responsible for investigating allegations of CPS employee misconduct. *Id.* at ¶ 11. The BOE is a municipal corporation organized and regulated under the laws of the state of Illinois and is responsible for oversight of CPS. *Id.* at ¶ 13.

As Inspector General, Fletcher has discretion to decide whether a matter will be investigated. [141] at ¶ 18. When conducting an investigation, the investigative file compiled by OIG investigators contain summaries of witness interviews and

---

[2] The parties filed their respective statements of facts and some of their briefs under seal. This is largely appropriate given the nature of the underlying investigation of misconduct at a high school. The Court cites to some sealed filings, but the information disclosed in this opinion cannot be justifiably sealed under the requirements of well-established Circuit law. *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 546-47 (7th Cir. 2002); *Union Oil v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000).

documentary evidence. *Id.* at ¶ 19. An Office of Inspector General ("OIG") staff attorney reviews the evidence and drafts a report making findings and recommendations regarding allegations of misconduct. *Id.* That report is then reviewed by an assistant inspector general and/or a deputy inspector general. *Id.* The draft is then reviewed by Fletcher. *Id.* Fletcher evaluates the reports and evidence collected by investigators and has the discretion to decide whether there is sufficient evidence to support a finding of misconduct. *Id.* at ¶ 21. Fletcher then signs off on the report if he agrees with its findings. *Id.* at ¶ 23.

### A. OIG Investigation of MLA

Starting in April 2019, the CPS OIG received complaints about staff members alleged to have engaged in sexual abuse of students at MLA. [141] at ¶ 14. The OIG initiated an investigation which examined allegations related to 29 individuals including current and former staff, teachers, military instructors, and volunteers. *Id.* at ¶ 16. The OIG's investigation included over 155 interviews with students, staff, alumni, and other potential witnesses, and compiled over 29,000 pages of documents including cell phone records and emails. *Id.* at ¶ 17. The OIG issued five investigative reports related to the MLA investigation to the members of the BOE, CPS's Chief Executive's Office, the Chief Education Officer for CPS, the general counsel for CPS, and CPS's chief talent officer. *Id.* at ¶ 26. The OIG also issued two Public Summary of Investigation Reports ("OIG Public Summaries"), in November 2021 and December 2021, that summarized the sustained finding in the five non-public reports. *Id.* at ¶ 30. The OIG Public Summaries did not identify any subjects of the investigation by

name, but referred to Galfer as "Subject F, the MLA Principal" or "Principal (Subject F)." [141] at ¶ 30; [146] at ¶ 22.

According to the OIG Public Summaries, the OIG's investigation substantiated allegations against ten different MLA staff members for misconduct including prohibited sexual activity, sexually motivated grooming of students, and failure to report allegations of misconduct. [141] at ¶ 31. Regarding Galfer specifically, the OIG Public Summaries stated that the OIG substantiated findings that "Subject F" failed to ensure an MLA volunteer completed a fingerprinting and background check before being allowed to engage with students. *Id.* at ¶ 39. The OIG also substantiated findings that "Subject F" failed to report or failed to timely report instances of sexual misconduct at MLA. *Id.* at ¶¶ 67-77. Galfer alleges that these findings by the OIG are false and defamatory. [141] at ¶¶ 39, 67; [1] at ¶¶ 17-18.

### B. Martinez's Press Conference

In November 2021, the OIG began issuing its non-public MLA investigative reports to the BOE and Martinez's office. [141] at ¶ 101. After learning about the OIG's findings that Galfer failed to report instances of sexual misconduct and the school culture at MLA, Martinez made the decision to fire Galfer. *Id.* at ¶ 106. Galfer was terminated effective November 6, 2021. *Id.* at ¶ 7. The CPS Talent Office also placed a "Do Not Hire" ("DNH") designation on Galfer's employment file. *Id.* at ¶ 106.

On November 19, 2021, Martinez held a press conference attended by reporters from Chicago area news organizations. *Id.* at ¶ 107. Martinez made the following

statements to the press which Galfer contends are false and damaging to her reputation:

- "The investigation uncovered inappropriate relationships between staff and students. Unfortunately, some of these relationships appear to have been tolerated or even covered up by other adults who had vowed to protect our children in their care. As of today, there are substantiated findings against 12 Marine Leadership Academy employees and one volunteer at the Academy."

- "Six failed to report and actively hid suspected violations."

- "We are requesting to pull the license of any employees that were a part of this."

- "We have a sworn duty, as educators, to protect children in our care, and to act with integrity and model appropriate behavior. So, to uncover a culture among several Marine staff, this flies in the face of these values, and it's extremely disappointing, to put it mildly."

- "The behavior uncovered by this investigation represents a stunning betrayal of trust and colossal failure of judgment and character on the part of far too many individuals."

- "Why am I still paying these individuals? Why haven't these individuals been arrested? Why haven't these individuals, even though I started terminating as immediately as I could, why couldn't I get them arrested?"

- "I am as frustrated as you are. I'm as frustrated; I'm angry, as a father myself with an 11 year old, including a 7 year old daughter. I'm just as frustrated."

- "…obviously, these individuals knew the laws, that's why they thought it was okay."

*Id.* at ¶ 110. Galfer contends that these statements are false and damaging to her reputation because they suggest that she failed to perform her duties as principal of MLA and that she was involved in misconduct. *Id.*

8

Martinez did not refer to Galfer by name until a reporter asked a question referring to Galfer by name. [141] at ¶ 113. The reported asked Martinez if he could "talk about what's going on with the principal, the former principal, Erin Galfer?" *Id.* Martinez replied in part that Galfer "was in a central office position, that [her promotion] happened over the summer before I started, as soon as I knew that she was involved in this, she was dismissed and terminated, and that just happened just recently." *Id.* at ¶ 114. Galfer also contends that this statement was false and damaging to her reputation. *Id.*

### C. Galfer's Post-Termination Job Search

Galfer's chosen occupation is school-based administrator. [146] at ¶ 30. A school-based administrator is responsible for a school's budget, ensuring student safety, and the execution of strategic plans including curriculum plans, lesson plans, classroom culture, instructional practices, and professional plans. *Id.* at ¶ 31. Galfer holds a "Type 75" license, which is required for educators to work as principals or assistant principals in public or recognized non-public schools in Illinois. [141] at ¶ 120. Galfer's license is valid throughout the state of Illinois. *Id.*

After being terminated from CPS in November 2021, Galfer applied for other jobs in her occupational field. [141] at ¶ 122; [146] at ¶ 32. The parties dispute whether Galfer applied to 17 or 24 positions that are within her occupational field of school-based administration. *Compare* [141] at ¶ 122 *and* [146] at ¶ 32. The positions Galfer applied to were either located in the Chicagoland area or were remote positions. [141] at ¶ 123. Galfer interviewed with nine different employers. [141] at ¶

122; [146] at ¶ 32. Galfer moved to the Chicago suburbs in 2022 and applied for positions in the nearby area. [146] at ¶ 35. Galfer also expanded her job search to positions outside of school-based administration. *Id.* In 2023, Galfer became discouraged with her unsuccessful job search and began to work as a self-employed consultant. *Id.* at ¶ 36. During 2023, Galfer passively searched for a job in her occupational field by monitoring job postings to see if there was a position she would want to apply for. [141] at ¶ 125. Galfer does not remember whether she applied for any positions in 2023. *Id.* In February 2024, Galfer resumed applying for positions but remained unsuccessful in obtaining new employment in school-based administration. [146] at ¶ 36.

## ANALYSIS

### I.  Due Process Claims (Count I)

#### a.  Occupational Liberty

Galfer claims that Defendants deprived her of her Fourteenth Amendment occupational liberty interest without due process by firing her and publicly communicating stigmatizing information that made it effectively impossible for her to obtain employment in the occupation of school-based administration. [1] at ¶¶ 101-112. To prevail on her claim, Galfer must establish that "(1) the defendant made stigmatizing comments about [her]; (2) those comments were publicly disclosed; and (3) [she] suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Biggs v. Chicago Bd. of Educ.*, 82 F.4th 554, 560 (7th Cir. 2023) (alterations in original) (quoting *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010)).

A plaintiff alleging an occupational liberty claim "faces a high hurdle to show that she has suffered a tangible loss of employment opportunities from a defendant's public stigmatizing statements." *Id.* A plaintiff must demonstrate that it is virtually impossible for her to find new employment within the same occupation. *Id.* (citing *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625–26 (7th Cir. 1986). "Mere frustration or delay in getting a new job will not suffice." *Id.*

### i. Public Stigmatizing Comments

The first element of an occupational liberty claim "requires the employee to show that a public official made defamatory statements about him." *Strasburger v. Bd. of Educ., Hardin Cnty. Community Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998). Stigmatizing statements "must be false assertions of facts"—"[t]rue but stigmatizing statements that preclude further government employment" and "statements of opinion" do not support this type of claim. *Id.* A stigmatizing statement is "public" where it "is distributed in a manner which would reach future potential employers of the plaintiff or the community at large." *Biggs*, 82 F.4th at 562 (quoting *Ratliff*, 795 F.2d at 626-27.

### 1. DNH Designation

Galfer alleges that Defendants publicly stigmatized her by placing a DNH designation on her personnel records. [1] at ¶¶ 104, 106, 108; [141] at ¶ 116. The Seventh Circuit has repeatedly held that this type of internal designation does not qualify as a public stigmatizing statement. *See Biggs*, 82 F.4th at 562 ("Because Biggs's DNH designation was internal to CPS, it does not qualify."); *Dunn v. Schmitz*,

11

70 F.4th 379, 383 (7th Cir. 2023) (plaintiff failed to show that "not-in-good-standing" designation was disclosed outside of employer's chain of command and personnel file); *Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991) ("The plain fact is that the mere existence of damaging information in Johnson's personnel file cannot give rise to a due process challenge.").

The DNH designation on Galfer's personnel records therefore cannot serve as the basis for Galfer's occupational liberty claim.

### 2. OIG Public Summaries and Martinez Press Conference

Galfer alleges that the OIG Public Summaries (attributed to Fletcher) and Martinez's November 2021 press conference publicly disclosed stigmatizing statements about her. These statements were clearly distributed in a manner which could reach future potential employers and were therefore public. *See Biggs*, 82 F.4th at 562. Defendants argue that Galfer has developed no evidence to establish that the OIG's substantiated findings of Galfer's misconduct were false, therefore her occupational liberty claim fails. [142] at 28.

However, "[a]t this juncture, the court must view the record in the light most favorable to" Galfer. *Thuet v. Bd. of Educ. of City of Chicago*, No. 20 C 1369, 2022 WL 6122622, at *6 (N.D. Ill. Oct. 7, 2022) (*Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)). Viewing the record in the light most favorable to Galfer, a reasonable jury could find that the OIG's findings regarding Galfers' conduct, which also served as the basis for Martinez's statements about Galfer at the press conference, were not true. Galfer disputes many of the OIG's factual findings

about her, including that she failed to report instances of sexual misconduct by MLA staff. *See* [145] at ¶¶ 72, 75. The statements also go beyond mere labels of incompetence and implied that Galfer had "put in harm's way students under [her] care." *Thuet*, 2022 WL 6122622, at *6. There is therefore a factual dispute over whether Fletcher and Martinez's statements were stigmatizing. However, as explained below, Galfer's claim fails because she cannot show a tangible loss of other employment opportunities.

### ii. Loss of Employment Opportunities

"[T]o succeed in her occupational liberty claim, [Galfer] must show that she has been essentially frozen out from all meaningful opportunities to work as a school administrator." *Biggs*, 82 F.4th at 562. Galfer has failed to meet this high bar.

In *Biggs*, the Seventh Circuit found that seven job applications over a period of a "few months" was insufficient to show that the plaintiff was effectively blacklisted from her chosen occupation. 82 F.4th at 563. The Seventh Circuit noted that data from the U.S. Bureau of Labor Statistics showed that the probability of getting a job is at its highest after 21-80 applications. *Id.* at 564. The Seventh Circuit also found that the plaintiff had "apparently confined her search to Chicago's suburbs, even though she is licensed as a principal in the State of Illinois." *Id.* at 563. The plaintiff's "exceedingly brief" and "narrow search" failed to show that it was "virtually impossible" for the plaintiff to find a job as a school administrator. *Id.* In *Thuet*, the court found that one plaintiff's "success in obtaining interviews and two job offers in

education" showed that a "a reasonable jury could not find that she has been excluded from employment" in her occupation. *Thuet*, 2022 WL 6122622, at *7.

Here, the parties dispute whether Galfer applied for 17 or 24 different jobs in her chosen occupation of school-based administration. *See* [141] at ¶¶ 122; [145] at ¶ 122. Galfer testified that she had become "quite picky" in deciding which positions to apply to and that she had "kept a watchful eye on some target school districts" where she wanted to work. [141] at ¶¶ 123-124. Galfer's job search was also largely focused on Chicago's northwest suburbs where she had moved following her termination from CPS. *Id.* at ¶ 123. Galfer also paused her job search in 2023 when she began to work as a self-employed consultant. [146] at ¶ 36. Galfer testified that she was "passively searching" for a job in school-based administration during that time in 2023, but she could not remember whether she had actually applied to any positions that year. [141] at ¶ 125. Galfer enjoyed some success in her job search, interviewing for approximately 9 different positions and being hired for one job although she was terminated shortly after being hired. [141] at ¶ 122; [146] at ¶¶ 32-34.

Based on this record, no reasonable jury could find that Galfer has been "essentially frozen out" of her chosen occupation. *Biggs*, 82 F.4th at 562. Even if Galfer applied to 24 positions, that is still at the low end of the 21-80 applications where the probability of getting a job is the highest. *See id.* at 564. Given the relatively low number of positions Galfer applied to, the limited geographic breadth of her search, and the long pause in her search, Galfer "simply did not apply to enough school administration positions for a sufficiently lengthy duration of time to permit a

14

reasonable jury to find that she has been excluded from that occupation altogether." *Id.* at 563. Galfer's success in obtaining interviews and at least one job offer in her chosen occupation also shows that she has not been excluded from the occupation. *See Thuet*, 2022 WL 6122622, at *7. "[N]o reasonable jury could find that [Galfer] has experienced anything more than the customary difficulties and delay that individuals encounter when looking for a new job, especially where, as here, they were fired from their previous one." *Biggs*, 82 F.4th at 563.

Galfer's occupational liberty claim therefore fails and Defendants are entitled to summary judgment.

### b. Pre and Post Termination Hearings

Galfer also alleges in Count I that Defendants violated her due process rights under the Fourteenth Amendment by terminating her without providing a pre-termination or post-termination hearing. [1] at ¶ 105. Defendants argue that Galfer was an at-will employee when she was fired and therefore was not entitled to any pre-termination due process. [142] at 26. Galfer fails to respond to this argument and has therefore waived it. *See e.g.*, [144]; *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument [ ] results in waiver.").

Defendants also argue that Galfer was not entitled to a post-termination name clearing hearing because she cannot establish the elements of her occupational liberty claim. [141] at 27. The remedy available to a discharged employee who proves all the elements of an occupational liberty claim is a name-clearing hearing. *Strasburger*, 143 F.3d at 356 (citing *Codd v. Velger,* 429 U.S. 624, 627 (1977); *Zellner v. Herrick*,

639 F.3d 371, 378 (7th Cir. 2011). As discussed above, Galfer has not established the elements to her occupational liberty claim, therefore she is not entitled to the remedy of a post-termination name clearing hearing.

### c. Monell

Galfer asserts her due process claim against the BOE, which is an agency of municipal government. To recover against the BOE under Section 1983, Galfer must establish that her alleged liberty deprivation resulted from an express municipal policy, widespread practice, or was caused by a person with final policymaking authority. *Hawk v. Bd. of Educ. of City of Chicago*, No. 04 C 4263, 2007 WL 844578, at *14 (N.D. Ill. Mar. 16, 2007) (citing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691-94 (1978)). As discussed above, Galfer fails to establish the elements of her occupational liberty claim. "As a result, the court has no basis upon which to conclude that the Plaintiff could recover from the [BOE] under § 1983 for an alleged deprivation of liberty." *Hawk*, 2007 WL 844578, at *14.

## II. State Law Claims

Galfer also brings state law claims of defamation, false light invasion of privacy, and intentional infliction of emotional distress ("IIED") against Martinez and Fletcher. [1] at ¶¶ 113-126.

### a. Supplemental Jurisdiction

The usual practice in the Seventh Circuit is to "dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). However, this is a

"presumption and not a rule." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). "Judges are permitted the discretion to determine whether a state law claim should not be dismissed because of other considerations like judicial economy, convenience, fairness, and comity." *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001). Here, the litigation is over three years old, discovery has closed, and the application of Illinois law to the case is well-settled and straightforward, therefore the Court retains supplemental jurisdiction over Galfer's state law claims. *See id.*

### b. Absolute Immunity

Martinez and Fletcher argue that they are immune from liability against Galfer's state-law defamation, false light, and IIED claims. The Court agrees.

"Illinois courts have long held that executive branch officials of state and local governments cannot be civilly liable for statements within the scope of their official duties." *Novoselsky v. Brown*, 822 F.3d 342, 349 (7th Cir. 2016) (citing *Geick v. Kay*, 603 N.E.2d 121, 127 (1992)). "[E]ven if a statement is defamatory, under Illinois law, the defendants would have immunity for their statements made within the scope of their authority." *Klug v. Chicago School Reform Bd. of Trustees*, 197 F.3d 853, 861 (7th Cir.1999). The immunity "cannot be overcome by demonstrating 'improper motivation or knowledge of the statement's falsity, including malice.'" *Novoselsky*, 822 F.3d at 349 (citing *Klug*, 197 F.3d at 861; *Geick*, 603 N.E.2d at 127). "The scope of the immunity is broad." *Id.* at 350. "The sole consideration is 'whether the statements made were reasonably related' to the official's duties." *Id.* (quoting *Geick*,

603 N.E.2d at 127-28). "Depending upon the powers of the office, this scope might broadly include all official duties as well as the 'exercises of discretionary judgment' incident to those duties." *Novoselsky*, 822 F.3d at 350 (citing *Blair v. Walker*, 349 N.E.2d 385, 387 (1976)). Therefore, the question before the Court is whether Fletcher and Martinez "were acting within the scope of their official duties when they made the alleged statements in question." *Horwitz*, 260 F.3d at 617.

Galfer's state law claims are all based on the same conduct: Fletcher's statements though the OIG Public Summaries and Martinez's comments during the November 2021 press conference. Both Fletcher's and Martinez's statements fell within the scope of their authority and are therefore protected by absolute immunity.

### i. Fletcher

Defendants argue that the Inspector General is a public official responsible for investigating allegations of CPS employee misconduct, bringing transparency to the government, and keeping the public informed about significant investigations. [142] at 8. Defendants argue that it is therefore within Fletcher's authority to issue public summaries of investigations to provide CPS families, Chicago citizens, and other elected officials with timely updates on investigations. *Id.* Galfer concedes that it was within Fletcher's authority to investigate the allegations of misconduct at issue and issue the non-public reports of the investigation. [144] at 8. However, Galfer argues that Illinois statute only authorizes the Inspector General to "provide to the board and the Illinois General Assembly a summary of reports and investigations." 105 Ill. Comp. Stat. Ann. 5/34-13.1(e); *see* [144] at 8. Therefore, Galfer argues that it was

18

outside of Fletcher's authority to share the OIG Public Summaries with anyone other than the Board and the Illinois General Assembly. [144] at 8.

The Court concludes that the statements in the OIG Public Summaries, attributed to Fletcher, are protected by immunity. As Galfer concedes, the OIG's investigation into allegations of misconduct at MLA was clearly within the scope of Fletcher's authority. And the OIG's creation of reports summarizing the investigation's findings was also clearly within the scope of Fletcher's authority. While § 5/34-13.1(e) requires the Inspector General to provide summaries of reports and investigations to the Board and the Illinois legislature, the language of the statute does not prohibit the Inspector General from providing reports to other entities. Fletcher's decision to publicly disclose summaries of the investigation was therefore reasonably related to his official duties. Fletcher was clearly not acting in a personal capacity and was acting within his official capacity in an attempt to respond to the concerns of MLA parents and the public regarding the serious allegations of sexual misconduct at the school. *See Horwitz*, 260 F.3d at 617–18 ("It is evident that [defendants] were not acting in their personal capacities, but rather their official capacities when they were attempting to respond to parents' concerns").

Galfer also argues that Fletcher violated § 5/34-13.1(e) by identifying Galfer in the OIG Public Summaries by her job title. The statute states that summaries of reports and investigations "shall not contain any confidential or identifying information concerning the subjects of the reports and investigations." § 5/34-13.1(e). The OIG Public Summaries did not identify any subject of the investigation by name

and referred to Galfer as "Subject F, the MLA Principal" or "Principal (Subject F)." [141] at ¶ 30; [146] at ¶ 22. The OIG Public Summaries therefore appropriately anonymized the subjects of the investigation and did not disclose any personal identifying information about Galfer apart from her job title, which would be a necessary distinguisher in an investigation about misconduct allegations against multiple staff members.

Fletcher is therefore protected by absolute immunity for the statements in the OIG Public Summaries and the Court grants summary judgment in his favor on Galfer's state law claims.

### ii. Martinez

Martinez is similarly immune from suit for his statements at the November 2021 press conference. Galfer again argues that no statute or employment contract language expressly indicates that speaking at press conferences is an official duty of the CPS CEO. [144] at 5-7. But the "sole consideration is whether the statements made were reasonably related to the official's duties." *Novoselsky*, 822 F.3d at 350. Martinez's official duties include supervision and control over all schools within the CPS system and deciding whether to terminate a CPS employee. [141] at ¶ 8. "Although his responsibilities, as defined by the Illinois School Code, do not explicitly list interaction with the media, … this is a responsibility which falls within his duties." *Nagle v. Chicago Sch. Reform Bd. of Trustees*, No. 96 C 4150, 1999 WL 160234, at *6 (N.D. Ill. Mar. 10, 1999). "In light of the public's interest in its local

schools" and the serious nature of the allegations of misconduct at MLA, Martinez's press conference was reasonably related to his official duties. *See id.*

Martinez is therefore protected by absolute immunity for his statements at the November 2021 press conference and the Court grants summary judgment in his favor on Galfer's state law claims.

The Court does not reach Defendants' additional arguments that Galfer's state law claims are barred by the Illinois Tort Immunity Act because it finds that Defendants are protected by common law immunity.

## CONCLUSION

For the stated reasons, Defendants' motion for summary judgment [135] is granted. The Clerk is directed to enter judgment in Defendants' favor and against Plaintiff and terminate the case.

E N T E R :

Dated: July 11, 2025

_____
MARY M. ROWLAND
United States District Judge